JAP:HDM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

         - against -

EMERSON ERAZO SILGADO,

             Defendant.

- - - - - - - - - - - - - - - - - X

COMPLAINT

(T. 18, U.S.C., § 1956)

**15 M 003**

EASTERN DISTRICT OF NEW YORK, SS:

      DEREK AMALBERT, being duly sworn, deposes and states
that he is a Special Agent with the Department of Homeland
Security, Homeland Security Investigations ("HSI"), duly
appointed according to law and acting as such.

      Upon information and belief, in or about and between
February 2015 and July 2015, both dates being approximate and
inclusive, within the Eastern District of New York and
elsewhere, the defendant EMERSON ERAZO SILGADO, together with
others, did knowingly and intentionally conspire to conduct
financial transactions in and affecting interstate and foreign
commerce, to wit: the transfer of hundreds of thousands of
dollars in cash, the deposit of United States currency into the
accounts of FDIC insured banks and/or wire transmission of funds
from the United States to Colombia, which involved the proceeds

1

of specified unlawful activity, to wit: narcotics trafficking,
knowing (a) that the property involved in the financial
transactions represented the proceeds of some form of unlawful
activity with the intent to promote the carrying on of said
specified unlawful activity in violation of Title 18, United
States Code, Section 1956(a)(1)(A)(i); and (b) that the
transactions were designed in whole and in part to conceal and
disguise the nature, the location, the source, the ownership and
the control of the proceeds of specified unlawful activity, in
violation of Title 18, United States Code, Section
1956(a)(1)(B)(i).

      (Title 18, United States Code, Section 1956(h))

      The source of your deponent's information and the
grounds for his belief are as follows:[1/]

      1.    I have been a Special Agent with HSI for
approximately eight years.  During that time, I have
investigated numerous cases involving the importation and
distribution of illegal drugs and the laundering of narcotics
proceeds.  During the course of these investigations, I have
conducted or participated in surveillance, execution of search
warrants, debriefings of informants and reviews of taped

---

[1] Because the purpose of this affidavit is to state only
probable cause to arrest, I have not described all the relevant
facts and circumstances of which I am aware.

2

conversations and narcotics records.  Through my training, education and experience, I have become familiar with the manner in which the proceeds of illicit activities are laundered and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.    The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, members of HSI and other law enforcement agencies, and from review of various documents obtained by subpoena, request or database searches.  Furthermore, where portions of this affidavit describe surveillance, all surveillance was conducted by HSI agents or other law enforcement officers assigned to assist in this investigation.  The observations of the involved law enforcement officers have been related to me to supplement the activities that I personally observed.  To the extent that this affidavit discusses statements, the statements set forth below are summarized in part and in substance only.

COLOMBIAN MONEY LAUNDERING AND THE BLACK MARKET PESO EXCHANGE

3.    Colombia is one of the world's primary sources of cocaine and heroin.  Each year Colombian narcotics traffickers generate billions of dollars of narcotics proceeds.  In the United States, these narcotics are sold for dollars, almost always in cash, and often in small denominations.

3

4.    To profit effectively from this illegal activity, Colombian narcotics traffickers must find a way to "launder" these vast sums of cash, that is, to have the funds transferred to a place and in a form that the narcotics traffickers can use them and in a manner that avoids detection by law enforcement.

5.    Banking laws in both the United States and Colombia prevent narcotics traffickers from simply depositing drug monies into accounts in the United States and transferring them to Colombia or other countries, such as Venezuela.  As a result, narcotics traffickers must disguise, or "launder," the funds in order to hide their true source.

6.    The Black Market Peso Exchange (the "BMPE") is one of the primary methods used by Colombian narcotics traffickers to launder their narcotics proceeds.  The basic BMPE scheme typically operates as follows.  In Colombia, a narcotics trafficker owning narcotics proceeds generated in the United States and elsewhere outside of Colombia contacts a third party -- generally referred to as a "peso broker" -- who agrees to trade Colombian pesos he controls in Colombia in exchange for the cash narcotics proceeds in the United States and elsewhere outside of Colombia.  Once this exchange occurs, the narcotics trafficker, having received Colombian pesos in Colombia from the peso broker, has effectively laundered his money and is out of the BMPE process.  The peso broker, on the other hand, must now

4

do something with the drug dollars that he has acquired outside
of Colombia so that he can obtain more pesos to begin the BMPE
process again.

7.   To do so, the peso broker uses contacts in the
United States and elsewhere outside of Colombia to receive the
narcotics trafficker's drug proceeds he purchased, often
arranging for criminal associates to receive the drug proceeds
in suitcases or bags from the narcotics trafficker's operatives
who control the money.  After the money is physically
transferred, the peso broker uses additional contacts in the
United States to get the drug proceeds into the United States
banking system.  To avoid detection, this is often done either
through deposits into bank accounts in company names that are
intended to appear to be related to legitimate business activity
or through multiple deposits of small amounts of drug proceeds
into different bank accounts which are then consolidated into
larger accounts both in the United States and elsewhere outside
of Colombia.  The peso broker, still operating in Colombia, now
has a pool of narcotics-derived proceeds in the United States to
sell to individuals or companies in Colombia who desire United
States dollars.

8.   Persons in Colombia, either individuals or
companies, who have pesos to sell -- whether from legitimate
sources or not -- and who want to exchange pesos for dollars in

a manner that avoids Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government, then make arrangements with the peso broker. In an effort to conceal the true nature of these transactions, dealings between the Colombian dollar purchaser and the peso broker are almost always based only on verbal agreements and conducted without any paperwork. As a result, these transactions enable Colombians to avoid currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the Colombian government. Once the transaction is completed, the peso broker then uses his contacts in the United States and elsewhere outside of Colombia to transfer the drug proceeds he has accumulated from the narcotics trafficker to wherever the Colombian dollar purchasers ask for them to be transferred. Therefore, under the BMPE system, the drug proceeds can and often do end up in the accounts of Colombian individuals or companies who appear to have no direct involvement in narcotics-trafficking crimes.

9. All three parties involved in the BMPE process benefit: (a) the Colombian narcotics trafficker receives laundered pesos; (b) the Colombian dollar purchaser evades United States and Colombian currency exchange and income reporting requirements and the payment of taxes, tariffs, or duties owed to the Colombian government; and (c) the peso broker

makes a profit from commissions retained during the unofficial
currency exchange process.  Meanwhile, the BMPE process
frustrates the efforts of the United States, Colombia, and other
governments around the world to enforce their currency exchange
and income reporting requirements, to collect taxes, tariffs,
and duties owed to them, and to maintain the integrity of their
financial institutions.

THE INVESTIGATION

10.  For approximately the past year, HSI has been
investigating an international money laundering organization
that launders the proceeds from several drug trafficking
organizations ("DTOs").  The investigation has revealed that the
DTOs smuggle multi-kilogram quantities of heroin and cocaine
into the United States and distribute the drugs within the New
York area and elsewhere.  The investigation has also revealed
that the DTOs utilize a money laundering organization, which
employed associates in New York, including the defendant EMERSON
ERAZO SILGADO, to collect the proceeds of narcotics trafficking
activities and launder the proceeds through the BMPE.

11.  As part of their investigation into the
international money laundering organization, on or about July 2,
2015, law enforcement officials conducted surveillance in the
vicinity of 1201 Broadway, Brooklyn, New York 11221.  Law
enforcement officials observed the defendant enter the building

7

at 1201 Broadway, Brooklyn, New York 11221. Law enforcement
officials were able to identify the defendant based on review of
video footage of the defendant making six bank deposits in June
2015.  Law enforcement officials observed the defendant exit the
building and conducted further surveillance of the defendant.
Law enforcement officials observed the defendant enter a Bank of
America branch on the corner of 28th Street and Sixth Avenue in
New York, New York. Law enforcement officials observed the
defendant fill out a deposit slip while reviewing instructions.

12.   After observing the defendant fill out the
deposit slip inside the Bank of America branch, law enforcement
officials approached the defendant and identified themselves as
law enforcement.  Law enforcement officials asked the defendant
if he knew the person whose account he was depositing money
into, and the defendant stated that he did not.  Law enforcement
officials asked the defendant if they could search his bag.  The
defendant consented to the search.

13.   Law enforcement officials searched the
defendant's bag and recovered numerous deposit slip receipts, a
ledger book and $40,120 *#45,680* in cash.  Law enforcement officials then
asked the defendant if he would be willing to answer further
questions at their offices and the defendant responded
affirmatively.  At the offices, law enforcement officials then
provided the defendant with a written waiver of rights form,

8

which the defendant reviewed and signed. The defendant then admitted to law enforcement officials that he was working for a black market money broker and that he was being paid to make bank deposits. The defendant stated that he was involved in the laundering of narcotics proceeds since approximately February 2015. The defendant admitted that his role in the scheme was to retrieve amounts of United States currency from other co-conspirators, and then deposit the United States currency into various bank accounts. The defendant further admitted that he believed the money he was depositing was from proceeds of some form of illegal activity and that he believed the source of the funds could be narcotics trafficking.

WHEREFORE, your deponent respectfully requests that the defendant EMERSON ERAZO SILGADO be dealt with according to law.

Derek Amalbert
Special Agent
Homeland Security Investigations

Sworn to before me this
2nd day of July 2015


UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

9